**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Greensboro Division**

| | |
|---|---|
| KIMBERLY WEBB, *on behalf of herself and all individuals similarly situated,* | : : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. _____ |
| | : |
| YATTA OUTSOURCED PROCESSING SOLUTIONS, INC., AARON WALLIS BISHOP, DENNIS RAMIREZ, SANDRA KNIGHT, SUSIE CORTEZ, HE-LO RAMIREZ, LIANNE BERTOLUCCI, JENNY ADKINS, JESSIE KAI, and JOHN DOES Nos. 1-15, | : : : : : : : |
| | : |
| Defendants. | : |
| _____ | : |

## CLASS ACTION COMPLAINT

Plaintiff Kimberly Webb, *on behalf of herself and all individuals similarly situated*, by counsel, and for her Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.      Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020).  And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*.  This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as a "rent-a-tribe" scheme, a "recent incarnation of payday lending companies regulation-avoidance."  Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

2. Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions on usurious lending go searching for a small, easily dominated tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

3. Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, the tribal leaders and employees named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

4. In this case, Boost Credit Line ("Boost") holds itself out as a tribal lending entity owned and operated by the Mechoopda Indian Tribe of Chico Rancheria ("Tribe"). Boost issued a loan to Ms. Webb—a resident of North Carolina—for $1,000 at an interest rate of 688.11%, ***more than 86 times*** North Carolina's 8-percent interest-rate cap and ***more than 40 times*** the cap for payday loans of 16%. N.C. Gen. Stat. § 24-1, 24-1-1(c).

5. The Tribe—and, in turn, Boost—is controlled and directed by a Tribal Council. Defendants Dennis Ramirez, Sandra Knight, Susie Cortez, He-Lo Ramirez, Lianne Bertolucci,

2

Jenny Adkins, and Jessie Kai (collectively, the "Tribal Council Defendants") are members of the Tribe's Tribal Council and are sued here in their individual capacities, as outlined below. The Tribe's Constitution established the Council as the Tribe's "governing body" with the power to, in relevant part to: "promulgate an adopt ordinances, rules, and regulations necessary or incidental to the exercise of any of the powers and duties of the Tribe . . ."; "consult, negotiate, contract or conclude agreements with . . . any other person or entity, on activities which may affect the [Tribe]"; "administer all tribal assets and manage all economic affairs and enterprises of the Tribe"; "employ and discharge tribal employees"; "charter tribal enterprises, corporations, and associations"; and "tax or regulate commerce with the Tribe and within Tribal controlled lands." Tribe Const. art. VIII § 3. Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including Boost and another lending entity, Amicus Lending.

6.      Although holding itself out as an entity wholly owned and operated by the Tribe, Boost is in fact managed and operated by Defendant Yatta Outsourced Processing Solutions, Inc. ("Yatta"), and its non-tribal owners, managers, and investors, including Defendant Bishop. Bishop, through his company Yatta, and along with yet-to-be identified non-tribal coconspirators (the John Doe Defendants), is the true operator of Boost's usurious lending scheme and provides the day-to-day management, operation, investment, and customer service functions of the enterprise from its headquarters in Utah, far from the Tribe's reservation in California.

7.      Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the members of the class described below.

3

8.      Defendants and others not yet known to Plaintiff have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans.  This lawsuit challenges the legality of Boost's and the Tribe's other lending entities' high-interest loans and seeks damages and declaratory relief against co-conspirators participating in this illegal scheme, including those whose identities have been deliberately concealed.  More specifically, Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and state common law. Boost and others have likely collected tens of millions of dollars on void loans in violation of federal and state usury, licensing, and criminal statutes.

## JURISDICTION

9.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

11.      The Court also has personal jurisdiction over Defendants because they have conducted business in this District and Division, including the issuance of the high-interest payday loans that gave rise to Plaintiff's claims.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in North Carolina, including in this

4

District and Division, where Ms. Webb resides and applied for, obtained, and received the funds for the loan giving rise to her claims.

## PARTIES

13.     Plaintiff Kimberly Webb is a natural person and resident of this District and Division.

14.     Defendant Yatta Outsourced Processing Solutions, Inc. ("Yatta") is a Delaware corporation with its principal place of business in Utah. As detailed below, Yatta is instrumental in the creation, operation, and management of the usurious lending enterprise described herein.

15.     Defendant Aaron Wallis Bishop is a natural person and resident of Utah.  Mr. Bishop is the CEO and only officer of Yatta.  Mr. Bishop created Yatta to facilitate the making and collection of the usurious loans originated in the name of Boost.  As detailed below, Mr. Bishop personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable.

16.     Defendant Dennis Ramirez is a natural person residing in California.  He is the chairperson of the Tribal Council.  Both as chairperson and a general member of the Council, Defendant Ramirez's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control.  In performing these duties, Defendant Ramirez meets monthly with other members of the Council to review, perform, and implement high-level management of the Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Ramirez only in his individual capacity.

17.    Defendant Sandra Knight is a natural person residing in California. She is the vice chairperson of the Tribal Council. Both as vice chairperson and a general member of the Council, Defendant Knight's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control. In performing these duties, Defendant Knight meets monthly with other members of the Council to review, perform, and implement high-level management of the Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Knight only in her individual capacity.

18.    Defendant Susie Cortez is a natural person residing in California. She is the secretary of the Tribal Council. Both as secretary and a general member of the Council, Defendant Cortez's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control. In performing these duties, Defendant Cortez meets monthly with other members of the Council to review, perform, and implement high-level management of the Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Cortez only in her individual capacity.

19.    Defendant He-Lo Ramirez is a natural person residing in California. He is the treasurer of the Tribal Council. Both as treasurer and a general member of the Council, Defendant Ramirez's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control. In performing these duties, Defendant Ramirez meets monthly with other members of the Council to review, perform, and implement high-level management of the

6

Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Ramirez only in his individual capacity.

20.     Defendant Lianne Bertolucci is a natural person residing in California. She is an at-large member of the Tribal Council. As a member of the Council, Defendant Bertolucci's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control. In performing these duties, Defendant Bertolucci meets monthly with other members of the Council to review, perform, and implement high-level management of the Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Bertolucci only in her individual capacity.

21.     Defendant Jenny Adkins is a natural person residing in California. She is an at-large member of the Tribal Council. As a member of the Council, Defendant Adkins's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control. In performing these duties, Defendant Adkins meets monthly with other members of the Council to review, perform, and implement high-level management of the Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks monetary damages against Defendant Adkins only in her individual capacity.

22.     Defendant Jessie Kai is a natural person residing in California.  He is an at-large member of the Tribal Council.  As a member of the Council, Defendant Kai's duties include the chartering and oversight of Boost and the other lending operations under the Tribe's control.  In performing these duties, Defendant Kai meets monthly with other members of the Council to review, perform, and implement high-level management of the Boost and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators.  Plaintiff seeks monetary damages against Defendant Kai only in his individual capacity.

23.     The John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Fineday enterprise.  Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

A.     **State usury and licensing laws protect consumers from usurious loans.**

24.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

25.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including North Carolina, *i.e.*, the home state of Ms. Webb from which she applied for, received, and repaid her Boost loan.

8

### i.    North Carolina

26.    In North Carolina, the legal interest rate chargeable to consumers is 8%.  N.C. Gen. Stat. § 24-1.

27.    Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%.  N.C. Gen. Stat. § 24-1.1(c).

28.    Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest.  N.C. Gen. Stat. § 24-2.  If the interest has been paid, the borrower may recover twice the amount of interest paid.  *Id.*

29.    North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner.  N.C. Gen. Stat. §§ 53-166(a), 53-168.

30.    Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor.  N.C. Gen. Stat. § 53-166(c).  Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan."  *Id.* § 53-166(d).

31.    Defendants were never licensed to make consumer loans in North Carolina.

### xii. **Other State Usury Laws**

32.     Each state of residence of the putative class members in the below RICO Class definition also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[1]

## B. **Overview of the Tribal Lending Business Model.**

33.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

34.     Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[2] The collection of unlawful and usurious debt continues to be a major problem, in

---

[1] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3 N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

[2] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a

part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

35.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

36.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

37.     Over the years, payday lenders have used various schemes to evade applicable state and federal protections.  In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates.  Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

38.     Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states

---

repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

where, like North Carolina, payday lending is illegal. However, beginning in 2005, the Federal Deposit and Insurance Corporation began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

39.     As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[3] the shadow payday loan industry turned to Native American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

40.     Under this new "rent-a-tribe" model, the leadership of an economically impoverished tribe would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered. In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[4]

41.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under

---

[3] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

[4] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

42.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

43.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

44.     Often at the table were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

45.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received only a nominal amount of the proceeds from the loans.

46.     Upon information and belief, Rosette has represented the Tribe, including in the creation and implementation of its lending activities.

47.     To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute

resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

48.     Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans.  The loan agreements are typically structured to include a waiver of all state and/or federal rights, in favor of tribal law and dispute resolution provisions.  That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

49.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

50.     Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id*.[5]

51.     During the last decade, federal and state law enforcement agencies have also taken various actions to combat tribal lending schemes, including by example:

---

[5] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

14

a. In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[6] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[7]

b. The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

52. In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common

---

[6] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[7] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

53.     Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**C.     The Basic Structure of the Tribal Lending Model.**

54.     The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

55.     This is accomplished primarily through a document dubiously labeled a "servicing agreement."

56.     By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

57.     Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 1 at § 2.25.

58.     By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

59.     Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

60.     Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

61.     The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id*. § 3.5.1.

62.     As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶ 3.

63.     This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

64.     By way of another example, the Rosette law firm also used this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

65.     Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 3 at 2264–65.

66.     Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

67.     Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 4 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

68.     The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

69.     The Rosette law firm also setup the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 5.

18

70. In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

71. Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 6.

72. According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

73. Upon information and belief, the Rosette firm has represented the Tribe, including in its internet lending endeavors, to establish a nearly identical tribal lending model in this case.

**D. The Tribe's Usurious Lending Enterprise.**

74. The Boost lending enterprise is just another example of a rent-a-tribe scheme designed to circumvent state usury regulation while taking advantage of vulnerable consumers who are in such dire circumstances that they are willing to accept triple-digit interest rates on relatively small sums just to pay their bills.

75. For several years, the Tribe has been openly inviting and accepting rent-a-tribe partnerships with the shadow payday loan industry, using as a vehicle for these arrangements its

19

economic development arm, Mechoopda Economic Development Corporation, and its chartered lending enterprises, including Boost and Amicus Lending.

76.     The Tribe has neither the financial resources, the expertise, nor the technology needed to operate a national, multi-million-dollar lending enterprise such as Boost, let alone two, separate lending businesses.

77.     Indeed, both Boost and Amicus Lending operate in nearly every state in the United States, using loans to consumers through their respective websites. Upon information and belief, these lending enterprises have issued millions in loans and have portfolios worth hundreds of millions of dollars.

78.     Despite the apparent value of the Boost and Amicus Lending businesses that claim to be wholly owned and operated by the Tribe, the Tribe's own website does not identify either lending entity as part of its economic development initiatives.[8]

79.     The Tribe also has only 560 members, which is far from sufficient membership to wholly fund and support a multi-million-dollar lending enterprise in addition to its other economic development operations (which include a casino).

80.     Historic domain registration information for Boost's website, boostcreditline.com, also shows that it was originally owned by Daniel Finch, who was the Utah registered agent for Yatta prior to Mr. Bishop. In other words, Yatta, not the Tribe, operates Boost's website.

81.     The IP address for boostcreditline.com has historically been linked to the same IP address as the website for another high-interest tribal lender known to be associated with

---

[8] Mechoopda Indian Tribe of Chico Rancheria, https://www.mechoopda-nsn.gov/tribal-government/mechoopda-business-development.

Defendants Yatta and Bishop, Bison Green, even though Boost and Bison Green are supposedly operated by separate tribes in entirely different states (California and South Dakota).

82.     The IP address for Boost has also been traced back to an IP server owned and operated by Infinity Software, a non-tribal entity that advertises its "back end" payday lending services, including software that analyzes, underwrites, services, and collects payday loans issued by Boost, Bison Green, and several other tribal payday lenders.[9]

83.     Based on the above information, the structure of nearly identical tribal lending businesses, and upon other information and belief, instead of receiving meaningful benefits from the lending operation, the Tribe sanctions the operations of Boost, Amicus Lending, and its other lending businesses on behalf of nontribal participants who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.

84.     These nontribal coconspirators include Defendants Yatta and Bishop (collectively, the "Yatta Defendants"), as well as their yet-to-identified officers, operators, and investors (collectively, the "John Doe Defendants"), who are the true drivers of Boost's lending operations.

85.     To engage in this extremely profitable, but illegal business, the Yatta Defendants and the deliberately concealed John Doe Defendants have entered into agreements with the Tribe, the Tribal Council Defendants, Boost, Amicus Lending, and the Tribe's economic development corporation and others to make and collect on usurious loans in states across the country, including in North Carolina, and to keep their identity hidden from consumers and regulators.

86.     For example, as indicated by the prior domain ownership, Yatta is the true operator of Boost's website, which is the sole avenue through which Boost accepts applications for, issues, and services its usurious loans.

---

[9] https://infinitysoftware.com/payday-loan-software.

87. Defendant Bishop is the CEO and owner of Yatta and, through Yatta, operates Boost's lending business, including, upon information and belief, through servicing and loan agreements entered between he, Yatta, and tribal representatives on similar terms to those outlined above with respect to the LVD lending enterprises.

88. Upon information and belief, the Yatta and John Doe Defendants are also the primary—if not sole—source of funds for Boost's operations, and they produce all of the leads for Boost; manage the technology and call centers that issue and service Boost's loans; collect payments on the loans; and sell off nonperforming debts.[10]

89. According to its own website, Yatta is "the leader in outsourced processing" and advertises its ability to "develop customized solutions to meet your outsourced operations needs."[11]

90. In return for their central role in Boost's ostensibly "tribal" lending business, Yatta and its nontribal owners, managers, and investors (including Bishop and the John Doe Defendants) reap nearly all of the benefits from the lending scheme, raking in, upon information and belief, millions of dollars a year from the triple-digit loans issued by Boost and other lending entities under their control to thousands of low-income borrowers across the United States.

91. Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

---

[10] This allegation is further supported by other litigation against Yatta and Bishop where they have sought to enforce Boost's arbitration agreement. *See Ryan v. Yatta Outsourced Processing Solutions*, Case No. 2024-CA-003584 (Polk County, Fla.).

[11] Yatta, https://www.yattaops.com/ (last visited Jul. 23, 2025).

92.     Indeed, Boost's website states that it no longer offers loans in several jurisdictions, each of which correlate with jurisdictions in which state attorneys general have challenged the loans or private class action attorneys have filed suit.[12]

93.     Boost and the Tribe have also been identified for illegal conduct by state regulators, including, for example, the Washington State Department of Financial Institutions, which issued a notice in June 2025 that the Tribe "may be operating online tribal lenders," including Boost and Amicus Lending, and that such lenders and the Tribe "are not licensed by DFI and are not registered to conduct business in [Washington]."

94.     Additionally, each of Defendants is aware that many consumers have complained about the abusive lending practices used by Boost and other tribal lenders.

95.     For example, Defendants have received consumer complaints on Boost's Better Business Bureau ("BBB") profile that have cited Boost's practice of charging high interest on small-dollar loans.

96.     Indicative of Defendants' knowledge of their unlawful conduct, the Yatta Defendants have also taken steps to actively conceal their management structure and involvement in the Boost lending scheme.  For example, since starting boostcreditline.com under the name of a prior officer of Yatta, Yatta has now concealed the ownership of the domain behind a domain proxy service.

97.     Defendant Bishop has also owned and operated other tribal payday lenders, including Bison Green, Payday Lending Tree, LLC, and Debit Pay Solutions, LLC, all of which, like Boost, are in the business of issuing high-interest loans to consumers.  He is thus more than

---

[12] *See* Boost Credit Line, www.boostcreditline.com (footer) (stating "Boost Credit Line does not lend to residents of CO, CT, IL, MD, MN, NY, VA, VT, WV, Guam, [and] Puerto Rico").

aware of the illegality and regulatory and judicial scrutiny of tribal lending operations like Boost's, yet chooses to continue to operate and reap the millions in benefits of such operations under the tribal façade.

98.     Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate Boost to facilitate the issuance of high-interest, triple-digit loans that violate usury laws across the country.

99.     Upon information and belief, Boost, Amicus Lending, and other lending entities chartered by the Tribe operate under the oversight of the Tribal Council Defendants, without whose approval and legal sanction Boost could not operate.

100.    The Tribal Council Defendants continue to facilitate the illegal lending scheme by allowing Boost and Amicus Lending to make and collect on usurious and void loans in multiple jurisdictions, including North Carolina.

101.    Upon information and belief, none of the Defendants have applied for a consumer lending license any state with such laws.

102.    Boost's website includes the following disclaimer:

Boost Credit Line DBA "Boost", a tribal lending entity, is wholly owned and operated by the Mechoopda Indian Tribe of Chico Rancheria ("Tribe") a federally recognized Indian tribe and sovereign nation. Our business Boost was created for the benefit of the Tribe, operating pursuant to Tribal law, is licensed by the Tribe to offer consumer installment loans and is operated on tribal land.

103.    Despite these representations, Plaintiffs are unable to locate any information regarding Boost's operations within the Tribe's reservation or the existence of any Tribal law or license that governs Boost's operations.

104.    Defendants' attempts to evade state usury protections also extend to the form Boost consumer loan agreements, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision,

24

stating, *inter alia*, that "Neither this Agreement nor the Lender is subject to the laws of any State of the United States" and that only the laws of the Tribe and the Federal Arbitration Act shall apply.

105.     As such, the form agreements purport to strip consumers like Plaintiff of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including North Carolina, which have a long and robust history of precluding usurious lending operations like Boost's that burden their citizens with insurmountable debts.

106.     Further, the consumer loan agreement includes an arbitration provision that explicitly states that the arbitration may resolved only "in accordance with applicable Mechoopda Indian Tribe of Chico Rancheria tribal law."   The arbitration provision further states that the arbitration has the ability to "award all remedies available under . . . tribal law," while providing no such remedies available under state or federal law.

107.     To remove any doubt, in the "Applicable Law" subsection of the arbitration provision in its loan agreements, Defendants require the arbitration to apply only "the laws of the [Tribe] and the terms of this Agreement," without any ability for the arbitrator to even consider— let alone apply—substantive state or federal law.

108.     Thus, under the terms of their loan agreements, the putative class members prospectively waive any and all rights and remedies available to them under state and federal law, which violates the prospective waiver doctrine and nullifies the arbitration and choice-of-law provisions.

109.     Upon information and belief, the loan contracts issued to all putative class members by both Boost and Amicus Lending were substantively identical and all included the same unlawful prospective waiver of the class members' state and federal rights.

**E.     Plaintiff's Experience.**

110.     Taking advantage of the ostensible protections created by the tribal business model, upon information and belief, the interest rates charged on the loans issued to the putative class members were far more than twice the allowable interest rate permitted by state usury and licensing laws in Plaintiff's and the class members' respective states of residence.

111.     For example, Plaintiff Kimberly Webb applied for and obtained a loan from Boost in September 2024 from her home in North. Carolina for a principal amount of $1,000, which had an interest rate of 688.11%, far exceeding North Carolina's 8-percent interest rate cap.  Ms. Webb paid back more than she borrowed on this loan from her bank account maintained in North Carolina.

112.     Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Council Defendants, or Boost, or Amicus Lending has ever obtained a license to issue loans to consumers in any state, including North Carolina, let alone a license to issue the triple-digit interest loans to Plaintiff and the putative class members.

113.     Plaintiff and the putative class members applied for their loans on the internet while located in their respective states of residence. Upon information and belief, none of them ever traveled to the Tribe's reservation to obtain their loans.

114.     Plaintiff and the putative class members all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

115. As outlined above, the loans issued to Plaintiff and the putative class members violated the respective usury statutes of each of their home states and entitle Plaintiff and the class to the remedies provided under those states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.[13]

---

[13] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are "void"); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

27

116. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiff.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES)

117. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

118. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class—the "RICO Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Boost or Amicus Lending; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loan.

Plaintiff is a member of this class.

119. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a subclass—the "Boost Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Boost; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loan.

28

Plaintiff is a member of this class.

120. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Boost, Amicus Lending, and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

121. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

122. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

123. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members

of the class. Neither Plaintiff nor her counsel have any interests which might cause them to not vigorously pursue this action.

124.    Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3), and are being sued in their individual capacities.

125.    The Tribal Council Defendants, along with the Yatta Defendants, John Doe Defendants, Tribe and others, were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

126.    The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

127.    The members and associates of the Usurious Lending Organization shared various common purposes, including the evasion of state usury and licensing law, the operation of the "Boost" and "Amicus Lending" websites, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

128.    The Usurious Lending Organization assigned specific roles to the members and associates. The Yatta Defendants and John Doe Defendants designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements. The role of the Tribal Council Defendants was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

129.    The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

130.    The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce.  The Tribal Council Defendants perform their roles from the tribal lands in California but the John Doe and Yatta Defendants who are operating the Organization do so, upon information and belief, from locations in other states, including Utah.  The Organization sends loan proceeds into and collects payments from locations throughout the United States.

131.    The Tribe established these enterprises under a common scheme to establish multiple lending fronts that would allow the Tribe to generate revenue while permitting nontribal coconspirators, including Defendants, to share in the revenue generated from the lending entities.

132.    Defendants participated in and coordinated their efforts behind this common scheme, including, upon information and belief, through the sharing of resources among the lending entities, including technical, underwriting, and operational support; the sharing of funding; and the sharing of marketing efforts, including through the joint and/or shared purchase of borrower "leads" from credit reporting agencies and subsequent targeting of mailing and other advertising to those individuals.

133.    Defendants also jointly benefitted from each other's involvement in the enterprise by sharing the risks of such an obviously illegal enterprise among multiple entities and individuals, who could jointly front the costs of such risks, including any legal judgment.

134.    Alternatively, the Yatta Defendants, John Doe Defendants, Tribal Council Defendants and other coconspirators formed an enterprise for the operation of Boost as defined in 18 U.S.C. § 1961(4) (the "Boost Lending Enterprise"), and Defendants each participated and

31

conspired to participate in the operations of the Boost Lending Enterprise. Defendants are thus at least liable under RICO to Plaintiff and the Boost Subclass defined above.

135. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

136. Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the respective Enterprises' affairs in the collection of unlawful debt.

137. All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

138. As alleged, each of Defendants participated in the collection of unlawful debt.

139. Plaintiff and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Usurious Lending Enterprise and/or Boost Lending Enterprise, which money transfers would not have been made but for Defendants' conduct.

140. Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class and/or Boost Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**<u>COUNT TWO</u>:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

141. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

32

142. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of the RICO Class and Boost Subclass defined in Count One.

143. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Boost, Amicus Lending, and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

144. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

145. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

146. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative classes because her interests coincide with, and are not antagonistic to, the interests of the members of the classes she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the

33

action vigorously. Plaintiffs and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests which might cause her to not vigorously pursue this action.

147. Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

148. Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

149. Plaintiff and the RICO Class and Boost Subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

150. Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the respective Class Members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

151. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

152. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for herself and on behalf of the RICO Class and Boost Subclass defined in Count One.

153. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff also brings this claim for herself and the following subclass—the "North Carolina Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Boost; (2) from North Carolina, and (3) repaid more than the principal balance of the loans.

Plaintiff is a member of this subclass.

154. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Boost and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

155. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

156. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

157. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action

vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests which might cause them to not vigorously pursue this action.

158.   As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

159.   Plaintiff and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

160.   Accordingly, on behalf of herself and the classes defined above, Plaintiff seeks to recover from Defendants, jointly and severally, all amounts repaid on any loans issued by Boost and/or Amicus Lending.

<u>**COUNT FOUR**</u>
**Declaratory Judgment Under 28 U.S.C. § 2201**
**(CLASS CLAIM AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

161.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

162.   Pursuant to Rule 8(d)(2), Plaintiff alleges that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

163.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for herself and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Boost or Amicus Lending; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiff Webb is a member of this class.

164.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff also brings this claim for herself and on behalf of a subclass initially defined as follows (the "North Carolina Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with Boost or Amicus Lending; (2) from North Carolina; and (3) has an outstanding balance on their loan.

Plaintiff is a member of this subclass.

165.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Boost, Amicus Lending, and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

166.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws

37

governing the loans; (4) whether the loans are void under the respective state laws governing the loans; and (5) whether Plaintiff is entitled to declaratory relief.

167. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative classes. All are based on the same facts and legal theories.

168. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative classes because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor her counsel have any interests which might cause them to not vigorously pursue this action.

169. Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

170. None of the Defendants, nor Boost or Amicus Lending, were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

171. Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

38

172.    Plaintiff and members of the class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

173.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

174.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

175.    Accordingly, Plaintiff seeks a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable. Plaintiff also seeks to enjoin the Tribal Council Defendants, in their official capacity, from allowing collection on the loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiff as class representatives and her counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.    An Order declaring that Defendants committed the violations of law alleged herein;

D.    An Order declaring the loans issued to the Void Debt Class to be void and

unenforceable;

      E.      An Order providing for any and all injunctive relief the Court deems appropriate;

      F.      An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

      G.      An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

      H.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

      I.      An Order awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees; and

      J.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Respectfully submitted,
**PLAINTIFF,** *individually and on behalf of all others similarly situated*

By: */s/ Rashad Blossom*
Rashad Blossom (State Bar No. 45621)
**Blossom Law PLLC**
126 N. McDowell St.
2nd Floor
Charlotte, NC 28204
rblossom@blossomlaw.com
*Local Rule 83.1(d) counsel for Plaintiff*

Kristi Cahoon Kelly*
Andrew J. Guzzo*
Matthew G. Rosendahl*
**KELLY GUZZO PLC**

40

3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*

*\*Notice of Special Appearance forthcoming*

41